**ELTECH SYSTEMS CORPORATION,**
**Oxytech Systems, Inc.**

**v.**

**PPG INDUSTRIES, INC.**

**Civ. A. No. 85–1533–LC.**

United States District Court,
W.D. Louisiana,
Lake Charles Division.

Dec. 15, 1988.

---

Charles W. Lane, III, Harry S. Hardin, III, Mark A. Nelson, Jones, Walker, Waechter, Poitevent, Carrere and Denegry, New Orleans, La., John D. Foley, William S. Feiler, David M. Carter, Israel Blum, Morgan, Finnegan, Pine, Foley and Lee, New York City, for plaintiffs.

John S. Bradford, Stockwell, Sievert, Viccellio, Clements and Shaddock, Lake Charles, La., Edward M. O'Toole, Marshall, O'Toole, Gerstein, Murray and Bicknell, Chicago, Ill., for defendant.

## OPINION

VERON, District Judge.

This is a patent suit brought by plaintiffs ELTECH SYSTEMS CORPORATION and OXYTECH SYSTEMS INCORPORATED, (hereinafter referred to collectively as "OxyTech") under the Patent Laws, Title 35, United States Code to enforce U.S. Patent Nos. 4,489,025 and 4,410,411 (hereinafter the '025 and '411 patents, respectively) against defendant PPG Industries, Inc. (hereinafter referred to as "PPG").

This Court has jurisdiction of the parties and of the subject matter of this action by virtue of Title 28, United States Code, Section 1338.

Venue is proper and uncontested. 28 U.S.C. § 1400(b).

OxyTech is the present owner of the entire right, title and interest in and to each of the patents in suit, and the owner of all rights to recover damages for infringement of said patents. As the owner of the entire right, title and interest, OxyTech has the right to invoke the power of the state in order to exclude others from utilizing the patentee's discovery without its consent. *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

The validity and enforceability of all claims of both the '025 and '411 patents are uncontested in this action.

## BACKGROUND

### A. *The Chlor–Alkali Cell*

Chlorine and sodium hydroxide are sold as commodity chemicals. Chlorine is used in making numerous petrochemical products and intermediates and for other industrial purposes. Sodium hydroxide is widely used in the aluminum industry and for dyes and soaps. PPG's Lake Charles plant pro-

duces chlorine gas at a capacity rate of over 3,000 tons a day. Chlorine is produced by the electrolysis of salt brine obtained from local salt deposits. The electrolysis process involves passing an electric current of up to 75,000 amps through the aqueous salt solution (brine). The electric current separates the positively charged sodium ion (Na+) from the negatively charged chlorine ion (Cl−) in the salt solution (NaCl). The salt compound thus decomposes, freeing the chlorine and sodium ions.

This electrolysis process takes place in banks of large electrolytic cells. The electrolytic cell is a tank-like structure containing a metal mesh anode (positive plate) and a metal mesh cathode (negative plate). These two plates are separated by a small gap of about one-quarter inch. The narrower the gap, the greater the current efficiency of the system. Brine is continuously fed between the anode and cathode plates and the electric current flows from the anode to the cathode through this aqueous salt solution. In the process, the negatively charged Cl− ions are attracted to the positive anode plate and recovered as chlorine gas. Likewise, the positively charged Na+ ions are attracted to the negative cathode plate where they mix with the OH+ ions in water to form sodium hydroxide (NaOH) which is then recovered from the cell. Because they generate chlorine and sodium hydroxide, these electrolytic cells are sometimes referred to as chlor-alkali cells.[1]

### B. *The Diaphragm*

Between the anode and cathode mesh plates lies the third major and critical component of the chlor-alkali cell—the diaphragm. The diaphragm separates the anode and its surrounding anolyte fluid and gases (the anolyte chamber) from the cathode and its surrounding catholyte fluid and gasses (the catholyte chamber). This

---

1. Other ions, gasses and compounds are also formed during the electrolysis of brine. The chlor-alkali cell environment is potentially dangerous and very corrosive and turbulent. Hydrogen gas which is generated at the cathode during electrolysis can lead to dangerous explosions in the cell if it is allowed to mix with the chlorine gas which is generated at the anode.

The generation of sodium hypochlorite creates a chemically corrosive environment for the cell components. Likewise, the formation of hydrochloric acid and sodium hydroxide is chemically corrosive to the cell. In addition, the generation of gas bubbles and turbulent brine flow creates physical forces adversely acting on the cell components.

diaphragm is hydraulically permeable. It allows the brine to flow from the anolyte chamber to the catholyte chamber at a controlled rate and at the same time permits the passage of select ions.

The diaphragm must also be resistant to the chemically corrosive acid, caustic, and hypochlorite environment of the cell, and it must be able to withstand the turbulent, abrasive, erosive, tearing and swelling physical forces generated by the electrolysis process in the cell. To date, asbestos is the material which has been found to have the best combination of necessary properties for the cell diaphragm and is the material employed by PPG in its diaphragms.

The asbestos diaphragm is deposited directly onto the face of the cathode mesh plate by vacuum deposition from a slurry which is formed by dispersing asbestos fibers in cell liquor. Cell liquor is obtained directly from the catholyte chamber of operating chlor-alkali cells and thus contains both salt and sodium hydroxide (caustic) dissolved in water.

When the cathode mesh plate is immersed in the asbestos-containing cell liquor slurry, a vacuum pulls the slurry liquid through the mesh drawing the asbestos fibers tightly against the cathode, forming a compacted layer. When the deposited asbestos fibers have reached a thickness of about one-eighth of an inch on the cathode, the vacuum is turned off and the cathode is removed from the slurry. These deposition steps are old in the art of diaphragm technology and form no part of the invention here in suit.

Once the asbestos diaphragm is deposited onto the cathode, it is placed in a cell where it acts both as a separator and a filter. The diaphragm is located on the surface of the cathode which faces the anode and thus is between the anode and the cathode. At this point, the gap between the anode face and the asbestos diaphragm deposited on the cathode is about one-eighth inch. The in-place diaphragm serves to separate the anolyte chamber

from the catholyte chamber because it is relatively impervious to the passage of brine, and to the chlorine and hydrogen gases generated in the anolyte and catholyte chambers, respectively. At the same time, the diaphragm must permit the passage of some brine and sodium ions from the anolyte chamber to the catholyte chamber at a controlled rate of flow.

The rate of flow of the incoming brine feedstock to the anolyte chamber of the chlor-alkali cell is adjusted to be slightly more than the rate of flow through the diaphragm. This causes a differential level (head) of brine to be built-up in the anolyte chamber. This differential level provides the driving force for the flow through the diaphragm into the catholyte chamber.

## C. *Developments in Diaphragm Technology*

In the early 1970's, a new anode technology called Dimensionally Stable Anodes based upon the use of titanium metal replaced graphite anodes. The new, long life, metal anodes eliminated plugging of the diaphragm due to graphite particles, substantially extended the useful diaphragm life, and made the development of a dimensionally stable asbestos diaphragm economically attractive.

Further development of titanium metal anode technology led to the invention and introduction of the expandable anode in the early 1970's. The expandable anode gave the potential for diaphragm cells to be more electrically efficient and to perform at high current density for long periods of time. The expandable anode allowed a smaller gap to . be achieved between the anode and cathode which offered a great opportunity to improve the electrical performance [2] of the diaphragm cell.

One drawback of conventional asbestos diaphragms included a tendency to swell in operation to fill the gap between the anode and the cathode, resulting in a loss of current efficiency thus making the cell more costly to operate.

---

**2.** The electrical performance of a cell is in large part directly related to the voltage used to operate the cell. The voltage used to operate a cell is proportional to the gap between the anode and the cathode. Better electrical performance results in lower product costs.

The swelling of conventional asbestos diaphragms in operation (up to 800%) also required that the anode and cathode be spaced relatively far apart to accommodate the swelling. This wide spacing in the anode-cathode gap increases the cell voltage, again adding to the cost of cell operation.

A second drawback found with conventional asbestos diaphragms is that were the flow of brine through the cell interrupted by a power outage, diaphragms made only of asbestos would be damaged irreparably. Since power outages at an electrolysis facility are not uncommon, conventional asbestos diaphragms frequently needed replacement, resulting in increased operating costs.

### D. *Processes In Controversy*

Although there are two patents in suit, they describe a common invention which is claimed from different points of focus. Both patents derive from the same original application and describe the common invention in identical language.

Both the '411 and '025 patents in suit are entitled "Dimensionally Stable Asbestos Diaphragms" and both patents are directed to methods for preparing dimensionally stable asbestos diaphragms. The '411 patent was filed on January 17, 1973, and issued as a patent on October 18, 1983. The '025 patent was filed as a continuation of the '411 patent on December 14, 1978, to provoke an interference with a PPG patent, and the '025 patent was issued December 18, 1984.

### 1. *The Specification*

The specification (description section) of both patents emphasizes that the invention lies in providing a dimensionally stable asbestos diaphragm that is resistant to swelling during cell operation. The file history of the '411 patent defines dimensional stability as ensuring that "swelling of the diaphragm under load is limited to less than 25 percent of its original thickness." Thus, if the asbestos diaphragm swells more than 25% during cell operation, it is not dimensionally stable as defined in the specification and will not achieve the object of the invention.

According to the patent's specification, the reduced swelling is attained by adding a thermoplastic polymer to the asbestos diaphragm and then heating the diaphragm "to a temperature sufficient to allow the polymer to soften and flow and cause the polymer to bind adjacent asbestos fibers together ... whereby (on cooling) there is obtained a diaphragm, dimensionally stable under operating cell conditions, characterized by asbestos fibers bearing a discontinuous fused polymer coating thereon." The specification further states that the fused polymer coating "generally serves to fuse adjacent asbestos fibers together at their points of intersection."

### 2. *The Claims*

In determining whether an accused process infringes a patent's claims, the Court must apply a two-step decision making process. First, the Court must ascertain the scope of the claims. After the Court has construed the proper scope of the claims, it determines whether the claims, so construed, cover the accused device. *ZMI Corporation v. Cardiac Resuscitator Corporation,* 844 F.2d 1576, 1578 (Fed.Cir.1988); *Mannesmann Demag Corporation v. Engineered Metal Products Co.,* 793 F.2d 1279, 1282 (Fed.Cir.1986). Infringement, whether literal or by equivalence, is determined by comparing the accused process or device solely with the properly and previously construed claims. *SRI International v. Matsushita Electric Corp. of America,* 775 F.2d 1107, 1121 (Fed.Cir.1985).

All claims in issue, except claim 14 of the '411 patent, describe a method for preparing dimensionally stable asbestos diaphragms. These methods are set out in claim 1 of the '411 patent and claim 6 of the '025 patent. (Claim 14 describes a product prepared according to the method of claim 1.) Broadly stated, the methods encompass five steps.

The first step (a) involves forming a slurry of fibrous asbestos and a particulate thermoplastic polymer which is present in an amount sufficient to prevent substantial

swelling of the diaphragm. Substantial swelling is defined in the patent specification, as noted above and testified to at trial, as swelling more than 25% of the original diaphragm thickness.

In the second step (b), a slurry of asbestos fibers and particulate polymer is vacuum deposited onto a cathode. This step is not in controversy.

The third step (c) involves heating the deposited diaphragm to a temperature sufficient to allow the polymer to melt or fuse and flow, without the application of pressure, to form a discontinuous coating on the surface of the asbestos fibers and cause the polymer to bind adjacent asbestos fibers together. This step is the key step involved in OxyTech's infringement charge with respect to all claims in issue.

There is no controversy over the fourth step (d), which calls for cooling the heated diaphragm to room temperature.

A "whereby" clause ends claim 1 of the '411 patent and sets forth an additional requirement that the diaphragm obtained by steps (a) through (d) above is *dimensionally stable under operating cell conditions.* If this requirement of dimensional stability is not met, there is no infringement. Likewise, if the dimensional stability that is obtained in an asbestos diaphragm is not caused by the effects specified in steps (a) through (d), there is no infringement.

Claims 14 of the '411 patent is a product by process claim which has the same key limitations and requirements as set out in claim 1. This is also true for the other method claims asserted against PPG in the '411 patent.

Only claim 6 of the '025 patent in suit need be examined in order to determine whether PPG's methods infringe this patent. If that claim is not infringed, the other asserted dependent claim 9 (which incorporates all of the limitations of claim 6) cannot be infringed.[3] Claim 6 of the '025 patent recites a method of preparing an asbestos diaphragm containing a thermoplastic resin (polymer) wherein the diaphragm is heated to "melt" the polymer. The key issue with respect to claim 6 is whether PPG heats its diaphragms to melt the polymer contained therein. OxyTech agrees, as pointed out below, that the term "melt" in claim 6 of the '025 patent is not different from the effects of the heating step (c) of the '411 patent. Thus, for all practical purposes, the term "melt" in claim 6 of the '025 patent is to be construed in the same context as it is defined in the '411 patent. According to OxyTech's own admissions, the term properly carries with it all limitations set out in the '411 patent with respect to the purpose and effect of melting the polymer.

OxyTech contends that the phrase "heating the (asbestos) mat to melt the resin" encompasses heating the asbestos mat or slurry to fuse and flow a sufficient amount of the Halar, i.e., to obtain a sufficiently low melt viscosity of the melted resin so that the meted resin will flow under its own weight (without the application of mechanical pressing), to mechanically bind asbestos fibers.

### 3. *Prosecution History*

■ Where literal infringement is asserted, the prosecution history of the patents is used along with the specification to interpret the claim language. *Loctite Corporation v. Ultraseal, Ltd.,* 781 F.2d 861, 867 (Fed.Cir.1985); *Lemelson v. United States,* 752 F.2d 1538 (Fed.Cir.1985). Arguments made during the prosecution history are relevant in determining the literal meaning of claim terms, and such arguments, as well as other aspects of the prosecution history, must be examined to ascertain the true meaning of what the inventory intended to convey in the claims.

Both patents in suit were involved in lengthly prosecution proceedings in the Patent and Trademark Office (PTO), extending over more than 10 years. The '411 patent was filed first and is considered the

---

**3.** The "difference" between the claims of the '025 continuation patent and the parent '411 patent is that the claims of the '025 patent "concern specifying the salt and alkali (caustic) content of the slurry from which the diaphragm is formed." The differences between the '025 patent and the '411 patent are not material to any issue in this lawsuit.

"parent" in this case. The '025 was filed as a continuation application to "provoke an interference" with a patent that had been issued to PPG in 1977.

During the prosecution of both patents, OxyTech brought to the PTO examiner's attention certain prior art patents which were highly pertinent in determining whether OxyTech's invention was novel and unobvious. The PTO examiner used these prior art patents as a basis for rejecting the claims repeatedly throughout the prosecution of the application. Ultimately, OxyTech was able to distinguish over these prior art patents, but in doing so made certain arguments and amendments which are significant to a proper definition of the scope to which OxyTech's claims are entitled.

The main prior art patents OxyTech had to overcome during the prosecution of the '411 patent were ones issued to the same inventor, Joseph–Adrien Leduc. The earliest Leduc patent is U.S. 3,694,281 and the second Leduc patent is U.S. 3,723,264.

When the PTO examiner rejected Oxy-Tech's claims in light of the Leduc prior art, OxyTech sought to distinguish over that art by numerous arguments and declarations of the inventors. Throughout the prosecution file history and after numerous rejections by the examiner, OxyTech continued to distinguish Leduc's "softening" or "sintering" heat requirement by arguing that OxyTech's heat treatment must be sufficient to cause the polymer *to fuse, rather than merely soften,* that is "to convert from the solid to the liquid phase."

Thus, throughout the prosecution file histories of both the '411 and '025 patents in suit, OxyTech firmly maintained its position that the crux of its invention over the prior art patents was its requirement that the diaphragm must be heated to the point where the polymer therein was melted or fused to change from solid to liquid phase so that it could flow out and coat adjacent asbestos fibers, without the application of pressure, so that, on cooling, the polymer would bind the asbestos fibers together with sufficient strength to attain the object of the invention, to achieve dimensional stability and to prevent substantial swelling of the diaphragm during cell operation.

## INFRINGEMENT

█ The burden of proving literal infringement lies with the party charging infringement and the quantum of proof is a preponderance of the evidence. *Mannesmann Demag Corporation,* 793 F.2d at 1282; *Envirotech Corporation v. Al George, Inc.,* 730 F.2d 753, 758 (Fed.Cir. 1984).

The Court today finds that OxyTech has not met its burden of proving patent infringement for either the '411 or '025 patents, and therefore finds for defendant PPG.

### A. *The '411 Patent*

█ To prove literal infringement, Oxy-Tech must show that the polymer used in PPG's diaphragms has been heated to a temperature sufficient to cause it to melt or fuse, and flow to discontinuously coat adjacent asbestos fibers with a fused polymer coating and bind the fibers sufficiently to obtain a dimensionally stable diaphragm that does not swell substantially during operation in a chlor-alkali cell. OxyTech has not done this.

Claim 1 of the '411 patent, the broadest of the claims of the '411 patent being asserted by plaintiff, reads as follows:

1. A method of providing a hydraulically permeable dimensionally stable diaphragm on a foraminous chlor-alkali electrolytic cell cathode, which method comprises:

(a) forming a slurry of fibrous asbestos and a particulate thermoplastic fluorine-containing polymer mechanically and chemically resistant to the cell environment by mixing together said asbestos and polymer, said polymer being present in an amount sufficient to prevent substantial swelling of the diaphragm;

(b) inserting the cathode to be coated into said slurry and depositing a uniform mixture of asbestos fibers and

particulate polymer thereon by means of a vacuum;

(c) removing the coated cathode from the slurry and subjecting same to a temperature sufficient to allow the polymer to fuse and flow, without the application of pressure, and cause the polymer to bind adjacent fibers together without forming a continuous polymer coating on the fiber surface; and

(d) cooling the diaphragm coated cathode to substantially room temperature whereby there is obtained a diaphragm, dimensionally stable under operating cell conditions, characterized by asbestos fibers bearing a discontinuous fused polymer coating thereon.

### 1. *There is No Evidence That the Halar in PPG's Accused Diaphragm Melts or Fuses.*

As set out above, the Halar in PPG's asbestos diaphragm must be heated to a temperature sufficient to cause it to melt or fuse to fall within the claims of the '411 patent. The Court finds melt and fuse to be equivalent, that is, a change in phase from a solid to liquid form which allows the Halar particles to flow out to discontinuously coat adjacent asbestos fibers with a fused polymer layer.

The first test to be analyzed was conducted with test diaphragms which were deposited and baked according to PPG's procedure at its Lake Charles plant. These test diaphragms show no melting or fusing.

PPG attached small 3″ by 3″ test cathode screens to the vacuum manifold of its commercial sized cathode and vacuum deposited diaphragms onto those screens from the same slurry, in the same way, and at the same time it deposited the diaphragm onto its commercial cathode. The small cathode test screens remained attached to the commercial cathode while the commercial diaphragm was being baked on that cathode according to the normal Lake Charles baking cycle.

PPG then removed the baked test diaphragms from the cathode screens and examined them under a scanning electron microscope (SEM) at various high magnifications. SEM photomicrographs were taken of representative samples and identification of the photographed particles as being Halar was verified by energy dispersing x-ray analysis.[4]

At trial, Dr. Jendrzejewski, PPG's expert in SEM analysis, testified that the samples taken above all show the same thing—the Halar particles are clearly visible, are not melted or fused, and have the same surface appearance as unbaked Halar particles. Dr. Jendrzejewski found no evidence that the Halar particles had melted or fused in any fashion, either wholly or partially.

In January, 1988, PPG permitted OxyTech's trial counsel and its technical experts, Drs. Koenig and Brannan, to witness a repeat deposition and baking of the small cathode test diaphragms together with a full size commercial diaphragm at PPG's Lake Charles plant. PPG gave OxyTech diaphragms from those screens and allowed OxyTech's experts to take physical samples from the actual commercial diaphragm which they witnessed being deposited and baked to a maximum temperature of 425°F. Further, PPG gave OxyTech samples from a 3-day old commercial diaphragm and a spent diaphragm which was in actual service for over 500 days in electrolytic cell operation. Both diaphragms were from the Lake Charles plant and were baked to a maximum temperature of 425°F. OxyTech has presented no evidence that it ever attempted to conduct a SEM analysis or *employed any other means to determine whether the Halar particles in PPG's actual commercial diaphragm*

---

**4.** SEM analysis allows the viewer to observe physical characteristics of small particles which cannot be seen with the naked eye. The image is obtained by directing a beam of electrons onto the sample and displaying the resulting signal as an image on a video screen. The equipment also provides means for photographing displayed areas of interest, and the resulting pictures are called photomicrographs. These photomicrographs allow one to view the surface morphology (physical shape) of a particle at extremely high magnifications of up to 10,000X. SEM analysis is perhaps the best technique available for observing particle surface morphology and any changes that might occur in the particle after being subjected to heat.

*were melted or fused.* Thus, the Court finds no evidence that the Halar in PPG's diaphragm melts or fuses.

### 2. *Melt Tests Conducted With Halar Alone Failed to Establish Melting at 425°F.*

Other tests were conducted by both PPG and OxyTech in the course of this litigation to determine whether PPG's Halar melts or fuses when heated to 425°F. In these tests, Halar powder alone was heated in the laboratory at various baking temperatures both above and below the melting point of Halar and observed by a host of PPG and OxyTech experts.

Drs. Jendrzejewski and Ieyoub, PPG's trial experts, concluded that the sample baked at 425°F, the maximum temperature used at Lake Charles in baking PPG's commercial diaphragm, was the same as the unheated Halar and that the Halar particles showed no physical signs of melting or fusing, whereas the sample baked 470°F, higher than the published melting point of Halar, clearly melted and flowed into a puddle in the bottom of the dish. The Court viewed identical samples of Halar heated in the aluminum dishes and came to the same conclusion: at 425°F the Halar was unmelted; the sample baked at 470°F had completely melted and formed a fused puddle in the middle of the dish.

Dr. Jendrzejewski subjected the same samples to SEM analysis and presented the Court with representative photomicrographs which were enlarged in chart form. From these photomicrographs Dr. Jendrzejewski conclusively testified that he could observe no difference in the physical morphology between the unheated Halar and the Halar heated to 425°F. Both samples depicted identical surface characteristics typical of Halar 5004 powder. Both samples appeared to be granular in form with jagged, rough edges. Each Halar particle was individually distinct from the other and there was no visual evidence of any melting or rounding out of any surface features of any Halar particle. Dr. Jendrzejewski further testified that in his scanning of the entire sample of Halar heated to 425°F he found *no* particle which evidenced melting or fusing.

As seen by the SEM photomicrograph, the Halar heated to 470°F clearly evidenced melting. No individual Halar particle could be observed. All that could be seen was a smooth fused mass coating tightly bound to the surface of the aluminum dish.

Plaintiff contends that SEM analysis is "highly subjective." The Court rejects this position, finding that plaintiff offered no convincing evidence on this point, especially given Dr. Jendrzejewski's compelling testimony under both direct and especially cross-examination.

OxyTech's "aluminum dish" tests do not support the patent infringement allegation. First, the court rejects the results of Oxytech's "aluminum dish" tests given that pressure had obviously been applied to the samples—an operation which is expressly precluded by the '411 claim requirements that the heating be "without the application of pressure," and which according to Dr. Koenig's testimony, would enhance the coherence of the Halar particles. OxyTech's test was *unlike* PPG's test, where the aluminum dish was inverted over the sample so as not to touch or apply any weight or pressure on the Halar sample.

Second, these OxyTech samples were *not* heated according to PPG's baking cycle. No record was made of the oven temperature which would verify either the baking time or temperatures. No attempt was made to examine the Halar samples under the scanning electron microscope which was easily available for OxyTech's use. They were observed only with the naked eye.

Even with these shortcomings in methodology, OxyTech's tests show results favorable to PPG. These OxyTech samples were demonstrated to the Court during Dr. Koenig's testimony. The 425°F sample appeared to have been pressed down either before or after baking which flattened the powder evenly throughout the dish and compacted the particles. The 425°F OxyTech sample appeared agglomerated, but on inspection during cross-examination the Halar was effortlessly reduced to powder

after probing with a spatula and twinkling between the fingers. Clearly, there was no visual evidence of melting or fusing.[5]

The above testimony, the physical samples of Halar, and the SEM photomicrographs all show one and the same thing—PPG's Halar 5004 powder does not melt or fuse at 425°F either in its actual diaphragm or heated alone in an aluminum dish. No physical or visual observations have detected any melting or softening or fusing of Halar particles when heated according to PPG's bake cycle. Physically, the Halar particles retain their powdery form after heating to 425°F, and visually the Halar particles magnified 5000 times under SEM analysis show no change in physical shape or surface morphology. They remain as distinct individual particles.

3. *OxyTech's DSC Analysis Failed to Prove That the Halar in PPG's Accused Diaphragm Melts or Fuses.*

Differential Scanning Calorimetry ("DSC") is a method used to analyze the thermal profile of a material. The sample material is gradually heated at a specified rate to a temperature above its melting point. A graph records the thermal energy being absorbed by the sample as it reaches the melting point. From the resulting graph, a melting point can be determined for the crystalline portion of a given polymer and its melting onset temperature can be estimated by extrapolation. Dr. Koenig estimated from a DSC curve prepared by OxyTech that the onset of melting for the

30% crystalline portion of Halar began below 200°F.[6]

Dr. Koenig further testified that from this onset point he could determine that approximately 40% of the 30% crystalline portion of Halar was melted at 425°F, even though there may be no physical manifestations of melting apparent from a visual examination of the Halar particles themselves. No determination was made as to the temperature at which the 70% amorphous portion of the Halar polymer begins to soften and flow.

Allied Chemical, the original manufacturer of Halar, developed its own DSC curve showing onset of melting at 447°F, over *20°F higher* than the 425°F maximum temperature used by PPG. When this evidence is taken with Dr. Koenig's admission that no melting occurs below the onset temperature, the Court finds that no reliable evidence of PPG's Halar having melted at 425°F can be derived from OxyTech's DSC curves.

Both PPG experts, Drs. Jendrzejewski and Ieyoub, testified that heating Halar at 425°F produces no physical manifestations of melting, softening or fusing of Halar particles, as evidenced either by the naked eye or under the high magnification of the scanning electron microscope. The Court, after considering physical samples and SEM photomicrographs finds no physical evidence that these Halar particles have changed their distinctive shape in any way

---

5. Significantly, before these OxyTech tests were conducted for trial, OxyTech had performed fusion studies on Halar powder in the course of its normal research. This research was conducted by an OxyTech co-op researcher, T.C. Gard, under the supervision of Dr. Tsai, an OxyTech researcher intimately involved in polymer-modified diaphragm research. These tests confirm that Halar does not melt or fuse below its published melting point. Gard reported that Halar powder, when heated alone for 2 hours, was underfused at 230°C (446°F, over 20° *higher* than PPG's maximum temperature of 425°F); that it was partially fused at 235°C (455°F); and was well fused at 240°C (464°F, Halar's published melting point).

6. According to Dr. Koenig, Halar is made up of a crystalline portion and an amorphous portion, and it is the melting point of the crystalline

portion which is depicted in a DSC curve. The amorphous portion of a polymer also softens and flows above a certain temperature but does not have a clearly defined melting point and its flow point cannot be determined by DSC methods. Dr. Koenig testified that Halar is comprised of 30% crystalline and 70% amorphous portions, basing these figures on two literature articles.

The articles relied upon by Dr. Koenig deal only with an *experimental* Halar film, not Halar 5004 powder, and cannot be considered to be representative of the crystalline make-up of the Halar used by PPG. Halar'a manufacturer defines the crystalline make-up of Halar as 50% crystalline and 50% amorphous in a technical bulletin supplied to all of its customers including OxyTech.

which resembles melting or fusing of any kind.

Even were the Court to accept that some changes in the internal crystalline structure of the Halar molecules start to take place below 425°F, as Dr. Koenig testified, that change would not constitute melting or fusing as those terms have been defined in light of the patents' specification and prosecution history. Further, the DSC curve shows energy uptake by the Halar molecules. It *does not show* the temperature at which physical evidence of melting first occurs, or even when a change in particle morphology begins. DSC curves are theoretical in nature, can record energy uptake due to features other than melting, and cannot substitute for observations of the material to determine the physical manifestations of onset of melting.

The court thus rejects Oxytech's evidence claiming that the Halar in PPG's accused diaphragm melts or fuses. This means that PPG's process cannot infringe on Oxytech's patents, given the patent requirement that the polymer must be heated sufficiently to melt or fuse and flow.[7]

4. *The Halar in PPG's Accused Diaphragm Does Not Flow to Form a Discontinuous Fused Polymer Coating and Bind the Fibers Together.*

OxyTech has the burden of proving that the Halar *flows out to form a discontinuous fused polymer coating* on adjacent asbestos fibers. Flowing cannot be inferred from the DSC curves alone because not only must the Halar soften and flow, but also it must flow enough to form a discontinuous coating on the asbestos fibers. None of the physical evidence presented at trial by OxyTech showed that the Halar heated to 425°F in the presence of asbestos formed a fused discontinuous coating on adjacent asbestos fibers, and the

testimony of PPG's experts denies the existence of any such coating.

Mere adherence of Halar particles on an asbestos fiber would not constitute a coating, contrary to OxyTech's contentions. When distinguishing the claims of the '411 patent application over Leduc in the U.S. Court of Customs and Patent Appeals (now the Federal Circuit) OxyTech argued, with the advice and consent of the inventors, that Leduc's heat treatment:

"... merely achieve *adhesion* of the asbestos fibers to a polymer at points of asbestos fiber contact.... By comparison, Appellant's (OxyTech's) invention is the production of a diaphragm in which the asbestos fibers bear a 'discontinuous polymer coating' *not* Leduc's mat of asbestos fibers *simply adhered* to the polymer at points of fiber contact (with the polymer)." (emphasis added)

OxyTech cannot now construe "flowing to form a discontinuous fused polymer coating" as encompassing "any adherence" of a Halar particle to another particle or to an asbestos fiber.[8]

Both PPG and OxyTech have conducted tests that show heating Halar with and without asbestos fibers at 425°F does not effectuate the binding mechanism required by the claims.

As the Court was able to see in test samples and as Drs. Ieyoub and Jendrzejewski testified, the Halar particles did not bind to the asbestos fibers at 425°F. The 425°F sample looked like powder and fibers loosely mixed together. There was no evidence of adhesion or binding let alone evidence of a fused Halar coating on the asbestos fibers.

Samples from other tests conducted by OxyTech in an attempt to show binding of the Halar to the asbestos fibers were not presented at trial. These tests involved packing Halar powder into a glass cylinder,

---

7. *In addition to discounting the value of the plaintiff's DSC evidence, the court finds plaintiff's other experiments, such as the "candle test" and hot stage studies—transmitted light tests to be less persuasive than PPG's evidence.*

8. Moreover, mere adherence will not meet the further claim requirement that the coating should *bind* adjacent asbestos fibers so as to

achieve dimensional stability. OxyTech has not shown that heating Halar alone at 425°F evidences any binding to other Halar particles, nor that Halar heated in the presence of asbestos fibers to 425°F can bind the asbestos fibers together, let alone bind them with enough strength to achieve dimensional stability.

inserting an asbestos fiber into the middle of the Halar in some of the cylinders, and heating the cylinders to various temperatures. Apparently these tests were designed to show the degree of binding and shrinkage (flowing) of the packed Halar samples, but the test conditions bore no resemblance to PPG's depositing, baking, or operating procedures and Dr. Koenig admitted the results did not show whether dimensional stability would be achieved under operating cell conditions.

In order for the '411 patent to be infringed, the Halar in PPG's diaphragm must flow to form a discontinuous polymer coating. OxyTech has not carried its burden of proving that Halar heated to 425°F flows *to coat* and *bind* asbestos fibers together as required by the claims.

5. *The Halar in PPG's Accused Diaphragms Does Not Provide Dimensional Stability or Prevent Substantial Swelling.*

OxyTech has not met the ultimate test of claim 1—*"whereby* there is obtained a diaphragm, dimensionally stable under operating cell conditions...."* As noted above, dimensional stability is characterized by the prevention of substantial swelling, and substantial swelling is defined in the patents as swelling more than 25% from the diaphragm's original thickness. Thus, even if OxyTech had proved that some binding had occurred, the binding must be *sufficient to assure dimensional stability under operating cell conditions.*

When the terms appearing in the whereby clause of a claim were emphasized as being effective for distinguishing over the prior art and in securing the allowance of that claim during the prosecution of the patent, those terms must be deemed an essential feature necessary to the establishment of infringement. If an accused product or process lacks this essential feature, it does not infringe. *Aircraftsmen, Inc. v. Aircraft Equipment Co.,* 247 F.Supp. 469, 478 (S.D.Fla.1965), *aff'd* 383 F.2d 988 (5th Cir.1967); *Powder Power Tool Corp. v. Powder Actuated Tool Co.,* 230 F.2d 409,

415 (7th Cir.1956). The whereby clause in the claims of the '411 patent was relied upon to distinguish over the prior art during the prosecution of that patent. Thus, the requirement that a diaphragm prepared by the claimed method must be *dimensionally stable during cell operating conditions* must be viewed as essential to the allowance of those claims and essential to the establishment of infringement.

Plaintiff's own research negates this contention. A report prepared by OxyTech's researcher Dr. Tsai in March 1975 established that *in order for Halar powder to reduce swelling,* it had to be heated to or above its published melting point of 240°C (464°F). This work was later confirmed by an OxyTech co-op researcher who concluded that *only* when the diaphragm was heated to the melting point of Halar at 240°C (464°F) was the diaphragm dimensionally stable in a laboratory cell.

Evidence presented at trial showed the achievement of dimensional stability of a Halar-containing asbestos diaphragm heated below its melting point of 464°F for times long enough to allow for a caustic reaction to occur. PPG asserted and proved that caustic reaction, not the Halar, cements the asbestos fibers together. This process is not OxyTech's invention, but was developed and patented by PPG.

OxyTech had test results on a commercial scale which verified PPG's discovery. At least one commercial scale asbestos diaphragm containing no polymer and baked at 93°C (200°F) for 16 hours was installed in an OxyTech commercial chlorine plant at Painesville, Ohio, where it was operated for 4 months without any reported swelling problems. After 4 months of operation, the entire Painesville plant was shut down and the diaphragm evaluation ceased.

This Court finds that the PPG bake cycle is sufficient to provide the needed dimensional stability for its diaphragms without any binding assistance given by the Halar and that unmelted Halar acts to enhance permeability, not to bind asbestos fibers.[9]

---

9. OxyTech's attempt to show that Halar heated at 425°F contributes to the binding of asbestos

fibers and consequently the prevention of substantial swelling by presentation of a swelling

## 6. *Conclusion.*

OxyTech has failed in every attempt to show that PPG's low bake diaphragm meets the requirements of claim 1 of the '411 patent in suit. The Halar in PPG's diaphragm which is heated to a maximum temperature of 425°F does not melt or fuse; does not soften and flow; does not coat adjacent asbestos fibers with a discontinuous fused Halar coating; and does not bind asbestos fibers together so as to achieve dimensional stability in an operating chlor-alkali cell. Even OxyTech's own expert at trial, Dr. Koenig, could only speculate that there was a potential, or possibility, or an expectation on his part that the Halar would bind sufficiently to cause dimensional stability in PPG's diaphragms under operating cell conditions.

For the foregoing reasons, the Court finds that claim 1 of the '411 patent is not infringed by PPG.

Product claim 14 of the '411 patent calls for a diaphragm made according to the "process of claim 1." This claim cannot be infringed unless the diaphragm was made by a process employing the elements of claim 1. Since the Court has found that PPG's process does not fall within the scope of claim 1, claim 14 is likewise not infringed. Independent claim 10 varies from claim 1 only in defining the polymer as being granular, as opposed to particulate. All other claim integers are the same as claim 1, and accordingly claim 10 is not infringed for the same reasons that claim 1 is not infringed. The other '411 patent claims asserted by OxyTech are dependent claims which, by law, incorporate all of the limitations of independent claims 1 or 10 on which they depend.[10] Accordingly, none of the asserted dependent claims is infringed by PPG. The Court notes that dependent claim 20 uses the term "soften and flow" as opposed to "fuse and flow." The Court finds there is no material difference between these terms in the context of the specification, prior art, and prosecution history discussed above, and in any event, PPG does not meet the other claim 20 integers which are incorporated by law from claim 1, and thus claim 20 is not infringed.

In arriving at the above findings of non-infringement, the Court has considered the impact of the prosecution history on the proper definition to be given to the claim terms, melt, fuse, flow, coat, and bind to achieve dimensional stability. The Court further finds, however, that the definition it has given to those terms applies equally when they are considered only in light of

---

test recorded on video tape falls far short of showing that PPG's baking practices fall within the scope of the patents in suit.

The Court finds three deficiencies in this experiment: First, OxyTech chose not to follow PPG's bake cycle when preparing these test diaphragms, even though the cycle was well known to it. Instead, OxyTech brought the temperature up at about twice the rate used by PPG and thus used a shorter baking cycle, although the 425°F temperature was held for 2.5 hours. OxyTech's researcher, Dr. Brannan, had no satisfactory explanation for why PPG's baking cycle was not followed.

Second, OxyTech made no initial measurements of the Halar-containing mats soaked in brine and cell liquor, from which it could base accurate calculations for the percent swelling experienced by these mats. No records were kept of any such measurements, even though it was Dr. Brannan's normal practice to record data on a separate sheet of paper when conducting experiments and then later record the results in his notebook.

Third, none of OxyTech's swell tests were conducted under operating cell conditions, a curi- ous consideration since the OxyTech claims require the diaphragm to be dimensionally stable under cell operating conditions and OxyTech had laboratory test cells available in its own laboratory.

**10.** A dependent claim is one which contains an express reference to another claim, and it must be construed as incorporating by that reference all of the limitations of the claim to which it refers. (35 U.S.C. § 112). By definition, if the claim to which the dependent claim refers is not infringed, the dependent claim cannot be infringed, as a matter of law. *Jenn–Air Corporation v. Modern Maid Co.,* 499 F.Supp. 320, 329 (Del.1980), *aff'd* 659 F.2d 1068 (3rd Cir.1981); *see also* Chisum, *Patents* § 8.06[5] at 8–134 n. 10 (1987). Asserted claims 2–4, 13, 14, 18 and 20 are dependent on claim 1 and claims 11 and 22 are dependent on claim 10 of the '411 patent. Claim 9 of the '025 patent is dependent on claim 6. Since independent claims 1 and 10 of the '411 patent and independent claim 6 of the '025 patent are not infringed, none of these dependent claims are infringed by PPG.

the patents' specification and the deposition and trial testimony of the witnesses as to the way those terms would be understood by people having ordinary skill in the art. Indeed, none of the terms need be given anything other than their ordinary dictionary definition to be read consistently with the specification.[11]

This Court finds that OxyTech did not establish by a preponderance of the evidence that the Halar in PPG's diaphragm has been heated to the point where it melts or fuses, flows and coats asbestos fibers with a discontinuous fused polymer coating. Moreover, OxyTech did not establish by a preponderance of the evidence that a fused Halar coating on the asbestos fibers binds the adjacent asbestos fibers together on cooling. Further, OxyTech did not establish that there is any binding which is sufficiently strong to prevent substantial swelling or to cause the diaphragm to be dimensionally stable under operating cell conditions. All of these features are required by independent claims 1 and 10 of the '411 patent, and accordingly, PPG does not infringe these claims.

### B. *The '025 Patent*

■ Independent Claim 6 of the '025 patent reads as follows:

6. In a method of preparing an asbestos diaphragm containing a thermoplastic resin which method comprises forming a fibrous asbestos mat having the resin therein and thereafter heating the mat to melt said resin, the improvement wherein the method comprises depositing said asbestos diaphragm from an aqueous slurry consisting essentially of (1) water, brine or cell liquor or mixture thereof and (2) from about 5 to 30 grams per liter of total asbestos and resin, wherein the resin is about 1.0–70% by weight, of the total asbestos and resin and wherein the resin is selected from the group consisting of:

A. hydrocarbon resins;

B. halocarbon homopolymers containing chlorine, fluorine or their mixtures; and

C. copolymers having hydrocarbon and halocarbon moieties wherein the halocarbon moieties contain fluorine, chlorine or their mixtures.

Claim 6 of the '025 patent recites a method of preparing an asbestos diaphragm containing a thermoplastic resin (polymer) wherein the diaphragm is heated to "melt" the polymer. The key issue with respect to claim 6 is whether PPG heats its diaphragms to melt the Halar polymer contained therein.

In responding to PPG's inquiry whether OxyTech contends that the term "to melt," read in light of the specification and file history of the '025 patent, is to be given a different meaning from the term, "fuse and flow", as defined in the '411 patent, OxyTech in its supplemental Answer to Interrogatory 15, unequivocally stated as follows:

"As presently advised, the concept of the term 'to melt' as used in the '025 patent (and in U.S. Patent No. 4,065,534 from which the term originated), is *equivalent* to the concept represented by the term 'to fuse and flow' contained in both the '025 and '411 patents. It is clear from a reading of the specifications in the '411 and '025 patents in light of the interference proceedings with U.S. Patent No. 4,065,534 that both expressions relate to obtaining sufficient melt viscosity in a given polymer so that the polymer will flow to bind asbestos fibers. Therefore, with respect to a highly crystalline polymer, the concept of 'to fuse and flow' is equivalent to the concept of 'to melt' in that there is sufficient conversion of the crystalline portion of the polymer to the amorphous so that the melt viscosity is sufficiently low to flow and bind asbestos fibers." (emphasis added).

Moreover, during the prosecution of the '025 patent application, OxyTech argued that the key to the process of the '025

---

11. In arriving at the above findings of non-infringement, the Court has also weighed the expert testimony submitted by OxyTech and PPG, and has found the testimony of PPG's experts, Drs. Jendrzejewski and Ieyoub to be more credible, competent, and convincing.

claims involves the step wherein the diaphragm is heated at a temperature high enough to melt the Halar (polymer) and that the proper construction of that term is to be made only within the confines of the '411 patent's disclosure and claims. In this regard, the term "melt" in the '025 claims must carry with it all the limitations set out in the prosecution file history of the parent '411 patent when construing the term "to melt". This finding is corroborated by OxyTech's inventor Fenn who testified that the process of "fuse and flow" in the '025 patent includes *discontinuously coating* and *binding the asbestos fibers so as to obtain dimensional stability.*

As conclusively set out above, there is no probative evidence showing that the Halar particles melt at the temperatures employed by PPG's bake cycle.

The SEM photomicrographs and the physical samples presented at trial by both PPG and OxyTech establish that Halar particles heated at 425°F according to PPG's bake cycle retain their particulate identity and do not change their distinctive physical surface morphology in any way when compared to unheated Halar particles. Likewise, DSC curves presented by OxyTech at trial do not establish that the Halar is melting or even beginning to melt internally at PPG's baking temperature.

Further, as stated above, claim 6 of the continuation '025 patent must be considered to incorporate all the limitations set out in its parent '411 patent prosecution history as being crucial to obtaining the key dimensional stability objective of the invention. These limitations include the requirements of coating asbestos fibers with a fused polymer layer and binding them with sufficient force to cause dimensional stability of the diaphragm, none of which are present here for the reasons previously stated.

### BAD FAITH LITIGATION

Having found no merit in plaintiffs' charge of infringement against PPG, the Court must address PPG's contention that the infringement charge was brought and maintained without reasonable basis.

The filing and maintaining of an infringement suit which the patentee knows, or on reasonable investigation should know, is baseless constitutes grounds for declaring a case exceptional under 35 U.S.C. § 285 and awarding costs, attorney fees, and expenses to the accused infringer. *Hughes v. Novi American, Inc.,* 724 F.2d 122, 125 (Fed.Cir.1984); *see also, Standard Oil Company v. American Cyanamid Company,* 774 F.2d 448, 455 (Fed.Cir.1985).

Some background is needed to place PPG's contentions and OxyTech's defense in context. The original complaint in this case was filed in June, 1985. After documentary production, but before deposition discovery, the parties engaged in extensive settlement negotiations. Early on during those negotiations, PPG informed OxyTech that it had changed its method of preparing Halar-containing diaphragms from high-bake, wherein the diaphragm was heated to some 50 degrees above the published melting point of Halar, to low bake, wherein the diaphragm was heated to a point some 40 degrees below the published melting point of Halar. As a result of the negotiations, the high bake diaphragms were settled out of the case.

In furtherance of an attempt by PPG to settle on the low bake diaphragms as well, PPG voluntarily provided a detailed description of the preparation and baking procedures it used for its Lake Charles commercial low bake diaphragms, together with representative oven charts recording the actual times and temperatures employed in the PPG bake cycle. OxyTech assigned two scientists to evaluate the PPG information: Dr. Fenn and Dr. Brannan. Dr. Fenn is a named co-inventor of the patents in suit and is experienced in the field of chlor-alkali electrolytic cell diaphragms. Dr. Brannan also has experience in this field as an engineer who provided technical support for licensees of OxyTech's chlor-alkali cell technology, including its polymer-containing asbestos diaphragms.

In the Fall of 1987, Dr. Fenn was given the write-up of PPG's low bake diaphragm preparation and baking procedures and asked to review it. Following his review, Dr. Fenn together with Dr. Brannan, examined samples of Halar powder which had been heated to a temperature of "around 425°F" and, according to his deposition testimony, concluded that the Halar particles fused, flowed and adhered to one another. Based on those observations, he judged, without any supporting tests, that the adhesion he had observed between Halar particles was sufficient to add dimensional stability to an asbestos diaphragm under operating cell conditions.

Dr. Fenn prepared a written report of the evaluations he had made with Dr. Brannan. This report was addressed to Oxy-Tech's Board member Dr. O'Leary, was provided to OxyTech's counsel. The Fenn report was withheld from production to PPG over objection and was not offered into evidence by plaintiffs at trial. *The tests which were the subject of the Fenn report and all other tests done by Oxy-Tech prior to May, 1988 were not made using Halar 5004, the grade actually used by PPG, but rather using a different grade of Halar.*

Despite the fact that the PPG low bake diaphragm preparation and baking procedures were available to OxyTech for over a year before the amended complaint charging those diaphragms with infringement was filed, no evidence was submitted that OxyTech had attempted to reproduce PPG's procedures or to evaluate any diaphragms which were prepared according to those procedures. Further, no evidence was submitted that OxyTech had attempted to evaluate *any* diaphragms under operating cell conditions in connection with this litigation.

According to Dr. Fenn's testimony, the proper test for determining dimensional stability is to prepare diaphragms, bake at different temperatures, operate them on a cell, and observe whether they swell. Dr. Babinsky testified to the same effect. These tests were not performed even though OxyTech's scientists had a battery of laboratory cells available in the same building in which they were conducting the tests they do rely upon.

No OxyTech scientist could testify that the OxyTech tests showed Halar provided sufficient adherence to cause dimensional stability. All agreed that "some" adherence does not establish "sufficient" adherence. Uncertainties such as these, which were admitted to by OxyTech's witnesses, do not provide a reasonable ground upon which to base a charge of infringement, especially when PPG's exact process was known but was neither followed, nor evaluated under operating cell conditions.

The tests which were performed by Oxy-Tech prior to the filing of the amended complaint were wholly insufficient to establish whether PPG's low bake diaphragms fall within the scope of the claims of the patents in suit. The proper grade of Halar was not used, PPG's preparation and baking procedures were not followed, no diaphragm was prepared, and no evaluations were made under operating cell conditions.

In addition, Dr. Fenn made a written report of the results of his evaluation of PPG's low bake procedures which was addressed to Dr. O'Leary, provided to Oxy-Tech's counsel, and probably provided to other high officers of OxyTech. Despite repeated requests by counsel for PPG that the Fenn report be produced, it was not produced during discovery and was not offered by plaintiffs at trial. An inference can be and is drawn by the Court that the Fenn report was not offered by plaintiffs because it was not favorable to OxyTech's contention that it had sufficient basis for filing the amended complaint herein.

The Court has considered the fact that OxyTech defends its conduct on the ground it was acting on oral advice of counsel when it authorized the filing of the amended complaint. This defense must fail because OxyTech has not revealed the content of the oral advice, nor the technical or legal basis for it. It has withheld the only written technical report pertaining to the pre-filing investigation (the Fenn report); it relied on advice of counsel and waived privilege with respect to the subject matter for

the first time using Mr. Skrabec's examination by PPG at trial; and then after PPG had made its *prima facie* case, plaintiffs put in nothing to rebut that case except to establish that Mr. Skrabec relied on vaguely described oral conversations with counsel. Under these circumstances, it was incumbent upon plaintiffs to reveal the technical and legal basis for orally given legal advice, to state what investigation had been made by OxyTech's attorneys, and to establish what technical information counsel had when it gave its advice. Without this evidence, the Court has no basis for assessing the reasonableness of the advice nor the reasonableness of plaintiff's reliance upon it. PPG's *prima facie* case thus stands unrebutted.

Mr. Skrabec's testimony regarding the contents of the oral advice of counsel was inadequate. As a result, the Court is deprived of the opportunity to assess the reasonableness of the opinion; to determine whether the opinion was well founded either in fact or in law; and to judge whether OxyTech could have acted in good faith in relying upon the opinion. This "non-showing" or mere conclusory account made by OxyTech is insufficient to sustain an advice of counsel defense. *Kori Corporation v. Wilco Marsh Buggies & Draglines, Inc.,* 761 F.2d 649, 656–7 (Fed.Cir. 1985), *cert. denied* 474 U.S. 902, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985); *Underwater Devices, Inc. v. Morrison–Knudsen Co.,* 717 F.2d 1380, 1390 (Fed.Cir.1983).

In addition, it was unreasonable for OxyTech to have failed to examine either the actual PPG commercial diaphragm or the laboratory size diaphragms provided to it by PPG in January, 1988, for the purpose of determining whether the Halar therein had melted, fused, flowed to coat adjacent asbestos fibers with a discontinuous fused polymer coating, or had bound to adjacent asbestos fibers so as to prevent substantial swelling and achieve dimensional stability under operating cell conditions. It was also unreasonable for OxyTech not to have conducted tests following PPG's actual preparation and baking procedures and evaluating the resulting diaphragms under operating cell conditions in preparation for trial, just as it was unreasonable not to do such tests before filing the amended complaint.

For the foregoing reasons, the Court further concludes that this is an exceptional case within the meaning of 35 U.S.C. 285 and awards PPG its reasonable costs, expenses, and attorneys fees incurred in defending against OxyTech's contention that PPG's low bake diaphragm infringes, together with prejudgment interest from August, 1986, the date that PPG informed OxyTech of its low bake process for preparing diaphragms.

THUS DONE AND SIGNED.