**ELTECH SYSTEMS CORPORATION and Oxytech Systems, Inc.,**
Plaintiffs–Appellants,

v.

**PPG INDUSTRIES, INC.,**
Defendant–Appellee.

No. 89–1681.

United States Court of Appeals,
Federal Circuit.

May 10, 1990.

Robert L. Beachtold, Fitzpatrick, Cella, Harper & Scinto, of New York City, argued for plaintiffs-appellants. With him on the brief were John A. O'Brien, Robert H. Fischer, Bruce C. Haas and Charles W. Almer, New York City. Also on the brief were John D. Foley, Israel Blum, David M. Carter and Peter DeLuca, Morgan & Finnegan, of New York City.

Edward M. O'Toole, Marshall, O'Toole, Gerstein, Murray & Bicknall, of Chicago, Ill., argued for defendant-appellee. With him on the brief was Christine A. Dudzik, Chicago, Ill. Also on the brief was Mark Levin, PPG Industries, Inc., Pittsburgh, Pa., of counsel.

Before MARKEY, Chief Judge,
MAYER, Circuit Judge, and
KELLEHER, District Judge.*

MARKEY, Chief Judge.

Eltech Systems Corp. and OxyTech Systems, Inc. (collectively OxyTech) appeal from that part of a judgment of the United States District Court for the Western District of Louisiana (Veron, J.), *Eltech Systems Corp. v. PPG Industries, Inc.*, 710 F.Supp. 622, 11 USPQ2d 1174 (W.D.La. 1988), in favor of PPG Industries, Inc. (PPG) based on a finding that Claims 6 and 9 of United States Patent No. 4,489,025 ('025) are not infringed. OxyTech further challenges the award of attorney fees to PPG. We affirm the judgment and the award, and we award to PPG its attorney

fees and double the costs it incurred in connection with this appeal.

## I. BACKGROUND

### A. The Patents and Accused Devices

On June 4, 1985, OxyTech sued PPG for infringement of claims 1–4, 10–11, 13–14, 18, 20, 22 of United States Patent No. 4,410,411 ('411) and claims 6 and 9 of the '025 patent. Both patents are directed to methods for preparing dimensionally stable asbestos diaphragms used in chlor-alkali cells in which chlorine and sodium hydroxide are produced by the electrolysis of salt solution (brine). Diaphragm technology and the chlor-alkali cell process were described by the district court in its comprehensive, thorough, and detailed opinion, 710 F.Supp. 622, 11 USPQ2d 1174, and need not be again described here.

OxyTech appeals from only the part of the judgment that rests on the finding that claims 6 and 9 of the '025 patent are not infringed.[1] Claim 6 of the '025 patent reads:

In a method of preparing an asbestos diaphragm containing a thermoplastic resin which method comprises forming a fibrous asbestos mat having the resin therein and thereafter heating the mat to *melt* said resin, the improvement wherein the method comprises depositing said asbestos diaphragm from an aqueous slurry consisting essentially of (1) water, brine or cell liquor or mixture thereof and (2) from about 5 to 30 grams per liter of total asbestos and resin, wherein the resin is about 1.0–70% by weight, of the total asbestos and resin and wherein the resin is selected from the group consisting of:

A. hydrocarbon resins;

B. halocarbon homopolymers containing chlorine, fluorine or their mixtures; and

---

* District Judge Robert J. Kelleher of the United States District Court for the Central District of California, sitting by designation.

1. Oxytech does not mention a reason for abandoning the '411 patent on appeal. As indicated

by the district court and in the text here, the two patents and their prosecution histories are so intertwined as to preclude a total disregard of the '411 patent and its prosecution history.

C. copolymers having hydrocarbon and halocarbon moieties wherein the halocarbon moieties contain fluorine, chlorine or their mixtures

(emphasis added).[2]

The Proceedings

PPG's original process (high bake method) included heating to 512°F its diaphragms containing the polymer, Halar®. During settlement negotiations, PPG informed OxyTech that it had changed to a low bake method, heating the diaphragms to only 425°F, or almost 40° below Halar's® published melting point of 464°F. PPG gave OxyTech a complete description and a demonstration of its low bake method. On November 24, 1987, all issues relating to the high bake method were settled, and on January 12, 1988, OxyTech filed an amended complaint asserting infringement of both patents by PPG's low bake method. The district court found neither patent infringed and, having found OxyTech's case so meritless as to be exceptional, awarded PPG its attorney fees.

We repeat here the highlights of the district court's opinion only to make more plain the meritless and thus frivolous nature of OxyTech's attack on the judgment.

### Claim Interpretation

At trial, Oxytech sought to prove infringement of claim 6 by showing that PPG so heated its diaphragms as to "melt" the Halar® polymer. In light of the prosecution history of both patents, OxyTech's answers to interrogatories, and the testimony of Fenn (coinventor of the inventions claimed in both patents), the court interpreted "melt" as corresponding to "allow the polymer to fuse and flow," and as meaning a change in phase from solid to liquid form which allows the polymer to discontinuously coat adjacent asbestos fibers with a fused polymer layer and thus achieve dimensional stability obtained by binding the asbestos fibers. The court noted that OxyTech was precluded (by arguments it made in the Patent and Trademark Office to distinguish prior art) from asserting that "melt" is met by "mere adherence" of Halar® particles to asbestos fibers.

### Noninfringement

The district court based its finding of noninfringement on the total lack of evidence that Halar® melted as required by the claim during PPG's low bake method. The court rejected OxyTech's differential scanning calorimetry[3] (DSC) evidence because: (1) it indicated no physical evidence of melting; (2) it did not indicate the temperature at which Halar's® amorphous portion[4] melted; (3) it conflicted with the DSC evidence of Allied Chemical, Halar's® manufacturer; and (4) if an internal structural change starts below 425°F, that change would not meet the "melt" limitation as it must be interpreted. It rejected OxyTech's melt tests (heating Halar® powder alone in aluminum dishes) because: (1) pressure was applied to the samples, a step expressly precluded by the '411 claims; (2) the tests did not follow PPG's baking cycle; and (3) the 425°F sample was effortlessly reduced to powder between the fingers. It

---

**2.** Because claim 9 depends from claim 6, our affirmance respecting claim 6 renders discussion of claim 9 unnecessary.

**3.** Differential scanning calorimetry is a standard method, according to the American Society for Testing and Materials, for measuring the melting endotherm peak of ethylene and chlorotrifluoroethylene copolymers such as Halar®. A sample of the material is heated at a specified rate to a temperature above its melting point. A graph of the thermal energy absorbed by the sample is generated. A peak is exhibited on the graph over the range of temperatures at which the polymer melts. The single temperature, designated the melting temperature or melting endotherm peak, is determined as the intersection of straight lines drawn on the graph tangent to the sides of the peak.

**4.** Halar® is made up of a crystalline portion and an amorphous portion. Only the melting of the crystalline portion may be measured by DSC. Halar's® manufacturer defines the makeup as fifty percent crystalline and fifty percent amorphous. The court rejected the testimony of Dr. Koenig, an expert witness for Oxytech, to the effect that Halar® is thirty percent crystalline and seventy percent amorphous, because Dr. Koenig based the figures on literature articles dealing with an experimental Halar® film, not the Halar® grade 5004 that PPG uses in its process.

rejected OxyTech's swell tests [5] (intended to show dimensional stability and fiber binding) because: (1) OxyTech's diaphragms were not prepared according to PPG's bake cycle; (2) no measurements of the diaphragm widths were made from which accurate percent swelling could be calculated; and (3) no swell tests (or any other tests) were conducted under operating cell conditions.[6]

Having found OxyTech's other evidence equally unpersuasive, the court remarked that OxyTech had *never* tested physical samples from PPG's actual commercial diaphragms, had employed *no* means for determining *"whether Halar® particles in PPG's actual commercial diaphragms were melted or fused,"* and had performed *no* tests under operating cell conditions.

Because OxyTech had woefully failed to carry its burden of proving infringement, the court could have stopped there. In a step helpful on review, however, the court went on to note that it found the testimony of PPG's experts to be "more credible, competent, and convincing;" that PPG's evidence showed that its Halar® 5004 powder did not melt or fuse at 425°F; that PPG's scanning electron microscopy [7] (SEM) test established that after heating to 425°F, the particles showed no change in physical shape or surface morphology when magnified 5000 times; that PPG's melt test employing its bake cycle resulted in no melting or softening and allowed the Halar® particles to retain their powdery form; and that caustic reaction, not Halar®, cemented the asbestos fibers of PPG's diaphragms.[8]

### Attorney Fees

The district court found the case exceptional pursuant to 35 U.S.C. § 285 and awarded attorney fees because the amended complaint asserting infringement by PPG's low bake method was meritless as filed and maintained. The court based that ultimate finding on numerous subsidiary findings: (1) OxyTech's expert Dr. Fenn performed no tests, yet concluded that PPG infringed; (2) before May, 1988, all tests were done with a grade of Halar® not used by PPG; (3) OxyTech did not even attempt to reproduce PPG's procedures, or to evaluate diaphragms produced according to those procedures, or to evaluate diaphragms supplied by PPG, or to evaluate any diaphragms at all under operating cell conditions; (4) OxyTech performed no tests showing sufficient adherence to cause dimensional stability; (5) Dr. Fenn's written report of his evaluation addressed to an OxyTech board member and provided to OxyTech counsel was withheld as privileged and not produced during discovery nor offered into evidence at trial, supporting an inference that it was not favorable to OxyTech; and (6) OxyTech's attempt to excuse its conduct on the basis that it was acting on oral advice of counsel while revealing no technical or legal basis for such advice, was inadequate.

## II. ISSUES

1. Did the district court clearly err in finding noninfringement?

2. Did the district court clearly err in finding the case exceptional on the basis of meritlessness?

## III. OPINION

### A. Infringement

#### Claim Interpretation

■ OxyTech meretriciously asserts that the district court erred in interpreting

---

5. In these tests, Oxytech immersed Halar®—asbestos diaphragms in brine and observed the swelling over time. The tests were presented at trial by videotape.

6. Oxytech had laboratory test cells in which operating cell conditions could have been simulated. The district court described those conditions as chemically corrosive and involving turbulent, abrasive, erosive, tearing and swelling physical forces. 710 F.Supp. at 625, 11 USPQ2d at 1176.

7. Scanning electron microscopy allows one to view a particle at extremely high magnification (up to 10,000 times) and to photograph the image.

8. The court said this last was verified by Oxytech's own tests in which it had baked a diaphragm containing no polymer at 200°F and used it for four months without reported swelling.

"melt" as a claim limitation to *visible* liquification. It does so by focusing on a phrase the court used in discussing one piece of evidence. A plain reading of the court's opinion unequivocally reveals that the court did *not* do what OxyTech says it did. On the contrary, it interpreted "melt" as described above: a change in phase from solid to liquid form which allows the Halar® (or other thermoplastic polymer) particles to flow out to discontinuously coat adjacent asbestos fibers with a fused polymer layer. Equally disingenuous is OxyTech's assertion that error occurred in interpreting "melt" as including the achievement of dimensional stability by binding the asbestos fibers as described in the specification of the '411 patent.

OxyTech's assertions respecting claim interpretation on this appeal are at best difficult to understand. The district court's interpretation of "melt" is virtually identical to that espoused by OxyTech (at another point in its brief): "that which causes the thermoplastic polymer resin to soften and flow enough to bind adjacent asbestos fibers together," Brief for Appellant at 34, and to that set forth in coinventor Fenn's testimony to the effect that "fuse and flow" in the '025 patent includes discontinuously coating and binding the asbestos fibers so as to obtain dimensional stability. Moreover, the district court's interpretation was properly based in part on the '025 prosecution, during which OxyTech said the proper construction of "melt" could be made only within the confines of the '411 specification and claims, and in part on OxyTech's supplemental answer to Interrogatory 15:

> As presently advised, the concept of the term "to melt" as used in the '025 patent ... is equivalent to the concept represented by the term "to fuse and flow" contained in both the '025 and '411 patents. It is clear from a reading of the specifications in the '411 and '025 patents in light of the interference proceedings with U.S. Patent No. 4,065,534 [a patent assigned to PPG, from which claims in the '025 were copied] that both expressions relate to obtaining sufficient melt viscosity in a given polymer so that the

polymer will flow to bind asbestos fibers. Therefore, with respect to a highly crystalline polymer, the concept of "to fuse and flow" is equivalent to the concept of "to melt" in that there is sufficient conversion of the crystalline portion of the polymer to the amorphous so that the melt viscosity is sufficiently low to flow and bind asbestos fibers.

It is conduct nothing short of shoddy to attack on appeal a district court's claim interpretation when that interpretation is clearly required by the appellant's and its expert's own statements, by what the appellant told the PTO, and by an appellant's answer to an interrogatory. OxyTech has so totally failed to show any error whatever in the district court's claim interpretation, or that it clearly erred in resolving any genuine evidentiary dispute pertinent to that interpretation, as to render its attack on claim interpretation frivolous.

### Noninfringement

█ The court correctly found that OxyTech had not proved infringement of the '025 patent. Far from meeting its burden by a preponderance of the evidence, OxyTech submitted *no* evidence probative of infringement. Having totally failed to prove its case at trial, it improperly tries to do so on appeal, asking this court to interpret the "evidence" it did adduce as so preponderant as to warrant a reversal of the noninfringement finding.

Disregarding the many reasons cited by the district court for rejecting its "tests" evidence, all of which reasons are set forth above, OxyTech continues its effort to obfuscate by asserting that the district court rejected its tests because they did not show visible melting. As discussed above, the court merely commented that one such test showed no such melting. If that fact served at all as a ground for rejection, it was only one of several on which the district court rejected OxyTech's tests. Noting that flowing, adhesion and dimensional stability cannot be inferred from OxyTech's DSC curves alone, and that there was no evidence demonstrating adhesion or dimensional stability, and no evidence of reliable

**810**

tests on PPG's diaphragms or on any diaphragms prepared by PPG's method, the district court was struck, as are we, by the plain and total absence of evidence of infringement. OxyTech's attack on the noninfringement finding is as frivolous as its attack on the court's claim interpretation.

## B. Attorney Fees

 OxyTech says the court applied an improper standard in finding this an exceptional case [9] because the court used the phrase "should know [the suit] is baseless," an application, says OxyTech, of a "simple negligence" standard. The label is inapt, for studied ignorance, as here, is substantially more than simple negligence. Moreover, what the district court *said* about the standard was: "The filing and maintaining of an infringement suit which the patentee knows, or on reasonable investigation should know, is baseless constitutes grounds for declaring a case exceptional under 35 U.S.C. § 285 and awarding costs, attorney fees, and expenses to the accused infringer." 710 F.Supp. at 636, 11 USPQ2d at 1185 (citations omitted).

OxyTech italicizes and focuses solely on the phrase "or on reasonable investigation should know" and ignores the phrase "patentee knows" in mischaracterizing the district court's basis for finding this an exceptional case. In so doing, OxyTech fails utterly to undermine or even diminish the many reasons for that finding that are painstakingly detailed on three pages, 710 F.Supp. at 636–38, 11 USPQ2d at 1185–87, of the district court's opinion. Under the heading "Bad Faith Litigation," the court there set forth in detail an overwhelming basis for finding that OxyTech brought and maintained this suit in bad faith. Though the court did not expressly find that Oxy-Tech *knew* its suit was baseless, many of its findings are compatible with and only with that view. The "should know" rubric obviously applies when a party attempts to escape the consequences of its conduct with the bare statement, "I didn't know."

A party confronted with the difficulty of proving what is in an adversary's mind must be at liberty to prove facts establishing that that adversary should have known, i.e. to prove facts that render the "I didn't know" excuse unacceptable.

Here, the district court considered all the circumstances and cited: PPG's demonstration of its process and provision of its diaphragms to OxyTech; OxyTech's total failure to employ that process or test those diaphragms although possessed of "a battery of laboratory cells available in the same building in which they were conducting the tests they do rely on", 710 F.Supp. at 637, 11 USPQ2d at 1186; OxyTech's earlier tests establishing that Halar® does *not* melt or fuse below its published melting point; OxyTech's tests that verified caustic reaction, *supra* note 7; Dr. Fenn's assumption, having conducted no supporting tests, that dimensional stability under cell conditions was achieved at 425°F; Oxy-Tech's failure to submit any evidence that it attempted to evaluate any diaphragms under operating cell conditions, even though its experts said that was the only way to test for dimensional stability; the uncertainties respecting "adherence" admitted by OxyTech's scientists; the total insufficiency of OxyTech's tests to establish whether there was infringement; Oxy-Tech's withholding of Dr. Fenn's report over PPG's objections; and the inference therefrom that Dr. Fenn's report of his evaluation of PPG's low bake procedures was unfavorable to OxyTech's case. Those findings and that inference, none of which has been shown to be clearly erroneous, are more than sufficient to establish Oxy-Tech's bad faith and thereby to render this an exceptional case.

 We said in *Machinery Corp. v. Gullfiber AB*, 774 F.2d 467, 471, 227 USPQ 368, 372 (Fed.Cir.1985) that under § 285 the interest of the patentee in protecting his statutory rights is balanced by the interest of the public in confining such rights to their legal limits. We there left open a

---

**9.** Reasonable attorney fees may be awarded in exceptional cases to the prevailing party. 35 U.S.C. § 285 (1982).

question of whether there should be different standards applicable to patentees and infringers. In response to OxyTech's argument implying that the district court struck an improper balance, we now reach the question and determine that there is and should be no difference in the standards applicable to patentees and infringers who engage in bad faith litigation. The different interests of the patentee and alleged infringer are adequately taken into account in the required evaluation of the totality of the circumstances. The balance is not tipped in favor of either side when each is required to prove the other guilty of bad faith litigation by clear and convincing evidence in light of the totality of the circumstances. *See* S.Rep. No. 1503, 79th Cong., 2d Sess. (1946), *reprinted in* 1946 U.S.Code Cong. & Admin.News 1386, 1387 ("The provision is also made general so as to enable the court to prevent a gross injustice to an alleged infringer.").

■ OxyTech's assertion that its unreasonableness was improperly considered is spurious. In *Machinery Corp.,* we said the reasonableness of the patentee in assessing infringement was a proper consideration. Where, as here, the patentee is manifestly unreasonable in assessing infringement, while continuing to assert infringement in court, an inference is proper of bad faith, whether grounded in or denominated wrongful intent, recklessness, or gross negligence. The alternative, abuse of the courts through manifestly unreasonable lawsuits based on uninvestigated allegations, would constitute a blot on the escutcheon of the law and a violation of Rule 11, Fed.R.Civ.P. The district court explicitly considered and properly rejected OxyTech's excuse that it acted on oral advice of counsel in filing and continuing its complaint. As the court correctly stated, the oral conversations were only vaguely described by a witness who knew very little about them and who could supply no technical or legal bases for any opinion that might have been given.

OxyTech's pretense that the district court found this case exceptional only because OxyTech "failed to prove" infringement because OxyTech was guilty of "mere error" in assessing infringement, or merely because it prosecuted a "lawsuit", is unworthy of response.

Similarly meritless is OxyTech's objection to the court's drawing an inference, from OxyTech's failure to offer it, that Dr. Fenn's report was unfavorable to OxyTech's contention that it had sufficient basis for filing its amended complaint. OxyTech misstates the record in saying that PPG never demanded production of the report; the record clearly shows that PPG repeatedly did so. OxyTech then says the "substance" of the report was known to PPG; but OxyTech did not place the *full substance* of the report in the record. Lastly, OxyTech says PPG could have further deposed Dr. Fenn, but his report was in important part technically based on tests performed by another scientist.

OxyTech has not persuaded us that the court's exceptional case finding based on all the circumstances cited by the court was clearly erroneous, nor has OxyTech shown that the court abused its discretion in awarding attorney fees. *See also Loctite Corp. v. Fel–Pro, Inc.,* 667 F.2d 577, 584, 213 USPQ 905, 911 (7th Cir.1981) (exceptional case where among other things patentee initiated suit with unconfirmed data to support infringement while refusing to produce test reports which would substantiate the charges and concealed a suspicion, later proven to be fact, that the test data were tainted and unreliable).

## C. Sanctions

■ This is another in what appears to be a gradually increasing number of frivolous appeals to this court. The district court here rendered a proper judgment and supported it with an excellent and thorough opinion replete with clearly correct findings and a flawless application of the law to those findings. As above indicated, OxyTech has based its appeal on baseless arguments and an attempt to retry its case, employing baseless arguments and misstatements of the record. That it found those practices necessary should have told it this appeal was frivolous. Accordingly,

we sanction OxyTech and require it to pay to PPG the sum of PPG's attorney fees and double PPG's costs on this appeal. Fed.R. App.P. 38.

AFFIRMED.