**ULTRA–TEMP CORPORATION,**
a Michigan corporation,
Plaintiff,

v.

**ADVANCED VACUUM SYSTEMS, INC., Defendant.**

No. Civ.A. 93–10102–RBC.

United States District Court,
D. Massachusetts.

Sept. 27, 1999.

---

Ralph A. Loren, Lahive & Cockfield, Boston, MA, Douglas W. Sprinkle, Ellen S. Cogen Lipton, Gifford, Krass, Groh, Sprinkle, Patmore, Anderson & Citkowsk, Birmingham, MI, for plaintiff.

Brandon F. White, Michael A. Albert, Foley, Hoag & Eliot, Boston, MA, Robert E. Wagner, Richard C. Himelhoch, Thomas K. Stine, Wallenstein, Wagner & Hattis, Ltd., Chicago, IL, Jeffrey R. Gargano, Linda A. Kuczma, Wallenstein & Wagner, Ltd., Chicago, IL, for defendant.

### *MEMORANDUM AND ORDER ON MOTION FOR ATTORNEY FEES (# 218)*

COLLINGS, Chief United States Magistrate Judge.

### *I. Introduction*

Short of trial, on November 9, 1998, judgment entered on all six counts of the amended complaint in favor the defendant Advanced Vacuum Systems, Inc. ("AVS") as against the plaintiff Ultra–Temp Corporation

("Ultra–Temp").[1] Given that this is a patent case, appeals were taken to the Federal Circuit. On April 16, 1999, AVS' appeal was dismissed upon agreement of the parties. (# 236) Approximately four months thereafter on August 4, 1999, the Federal Circuit summarily affirmed the district court judgment in an unpublished disposition. *See Ultra–Temp Corporation v. Advanced Vacuum Systems, Inc.*, 1999 WL 591357 (Fed.Cir.).

In late November of 1998, AVS filed a Motion For Attorney Fees (# 218)[2] which has been held in abeyance pending the outcome of the parties' appeals. With the Federal Circuit now having rendered its decision and AVS having been confirmed as the prevailing party, the time has come to address the defendant's outstanding motion.

## II. Discussion

AVS contends that Ultra–Temp did not properly investigate its claims of infringement prior to instituting the instant suit and, further, that the plaintiff pursued this litigation in bad faith. As a consequence, it is argued that this case should be found to be "exceptional" and AVS awarded attorney fees pursuant to the provisions of 35 U.S.C. § 285, Fed.R.Civ.P. 11, and 28 U.S.C. § 1927[3]. Ultra–Temp disputes the defendant's assertions.

### A. Applicable Law

#### (1) *Title 35 U.S.C. § 285*

 It is perhaps best to begin with a brief survey of the law since it carves out an exception to the general rule, the so-called American Rule, that parties bear their own attorney's fees. The principal basis of the defendant's motion is 35 U.S.C. § 285 which provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." AVS, as the party

seeking the sanction, "bears the burden of establishing, by clear and convincing evidence under a totality of the circumstances, that the instant case is 'exceptional.'" *Queen's University At Kingston v. Kinedyne Corporation*, 1996 WL 370170*1 (D.Kan.) *citing Eltech Sys. Corp. v. PPG Indus., Inc.*, 903 F.2d 805, 811 (Fed.Cir.1990); *Imagineering, Inc. v. Van Klassens, Inc.*, 53 F.3d 1260, 1267 (Fed.Cir.1995) ("To prevail, [movant] had to show by clear and convincing evidence that [nonmovant's] conduct was exceptional."); *Machinery Corporation of America v. Gullfiber AB*, 774 F.2d 467, 471 (Fed.Cir. 1985) ("only after the prevailing party has established the exceptional nature of the case by clear and convincing evidence should the district court decide whether or not to make the award [of attorney fees]."). Indeed, the Federal Circuit has instructed that

> When considering a request for an award of attorney fees under 35 U.S.C. § 285, the trial judge undertakes a two-step inquiry: he or she must determine whether there is clear and convincing evidence that the case is "exceptional," and, if so, whether an award of attorney fees to the prevailing party is warranted.

*Interspiro USA, Inc. v. Figgie Intern. Inc.*, 18 F.3d 927, 933 (Fed.Cir.1994) (citations omitted).

 Lastly, "[t]he award of attorney fees under § 285 is within the discretion of the court." *Cambridge Products, Ltd. v. Penn Nutrients, Inc.*, 962 F.2d 1048, 1050 (Fed.Cir. 1992).

 As defined in relevant decisions,

A case is "exceptional" where the plaintiff has engaged in "vexatious or unjustified litigation" or "frivolous suit." *Beckman Instruments, Inc. v. LKB Produkter AB*,

---

1. With the parties' consent this case was referred and reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. § 636(c).

2. At the same time AVS also filed a Memorandum In Support of its motion. (# 219) In due course Ultra–Temp submitted a Brief In Opposition (# 225) and then, with leave, AVS filed a Reply (# 231).

3. This statutory provision reads:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

Title 28 U.S.C. § 1927.

892 F.2d 1547, 1551 (Fed.Cir.1989). A suit is frivolous where the patentee knew, or should have known by reasonable investigation, that the suit was groundless. *Haynes Int'l, Inc. v. Jessop Steel Co.*, 8 F.3d 1573, 1579 (Fed.Cir.1993). Similarly, a court may infer bad faith where a "patentee is manifestly unreasonable in assessing infringement, while continuing to assert infringement in court." *Eltech Sys. Corp. v. PPG Indus.*, 903 F.2d 805, 811 (Fed.Cir.1990).

*Enpat, Inc. v. Microsoft Corporation*, 26 F.Supp.2d 811, 813 (E.D.Va.1998). As limned by the Federal Circuit, "conduct short of fraud, but in excess of simple negligence is sufficient for deciding that the case is 'exceptional' under § 285." *Machinery Corp. of America v. Gullfiber AB*, 774 F.2d 467, 473 (Fed.Cir.1985) (citations omitted).

### 2. *Rule 11, Fed.R.Civ.P.*

A second basis for the defendant's motion is Rule 11, Fed.R.Civ.P. The Complaint in this case was filed on January 19, 1993. Since the current version of Rule 11 became effective on December 1, 1993, it is not applicable to the filing of the Complaint or the steps taken (or not taken) prior to filing. The version of Rule 11 which was in effect at that time read as follows:

The signature of a party or attorney constitutes a certificate by the attorney or party by the signer ... that to the best of the signer's knowledge, information and belief *formed after reasonable inquiry* it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law, and that it is not interposed for any improper purpose ... If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, *shall* impose upon the person who signed it, a representative party, or both, an appropriate sanction, which may include an order to pay ... a reasonable attorney's fee.

Rule 11, Fed.R.Civ.P. (eff. August 1, 1983) (emphasis supplied).

The Federal Circuit has had occasion to apply the 1983 version of Rule 11 in cases involving allegations of patent infringement. In the case of *S. Bravo Systems v. Containment Technologies Corp.*, the Court vacated an order of the district court denying Rule 11 sanctions. It noted that:

in support of its charge that Bravo failed to conduct a reasonable inquiry before filing this lawsuit, CTC argues that Bravo's only evidence of pre-suit inquiry is that Mr. Bravo examined the CTC devices and literature and concluded that they infringed his patents. The evidence of record indicates that Bravo's attorneys relied on their client's lay opinion that CTC's devices infringed. Determining infringement, however, requires that the patent claims be interpreted and that the claims be found to read on the accused devices. Although one of Bravo's attorneys asserted in an affidavit that he "spoke to Mr. Bravo at length about what he had observed and his conclusions and analysis," and that he "conducted independent research into appropriate legal issues," there is no evidence that either of Bravo's attorneys ever compared the accused devices with the patent claims. If the district court finds that Bravo's attorneys conducted no investigation of the factual and legal merits of Bravo's claims other than to rely on Mr. Bravo's lay opinion that CTC was infringing the '024 patent, it would be difficult to avoid the conclusion that sanctions are appropriate.

*S. Bravo Systems*, 96 F.3d 1372, 1375 (Fed. Cir.1996) (citation omitted). To the same effect is the holding in the case of *Refac International, Ltd. v. Hitachi, Ltd.*, 921 F.2d 1247, 1256–57 (Fed.Cir.1990), *on remand*, 141 F.R.D. 281 (C.D.Cal.1991) (Brown, U.S.M.J.).

The question seemingly left open by the *S. Bravo Systems* case was whether a failure to investigate or a failure to conduct an adequate investigation could still be the basis for the imposition of Rule 11 sanctions if it were shown the claim which was filed was meritorious at least to the extent that it could not be found to be frivolous. In the *S. Bravo Systems* case, the Court, while noting that Rule 11 "calls for sanctions to be imposed ... for claims that are frivolous," *id.*

at 1374–75 (citing *Conn v. Borjorquez*, 967 F.2d 1418, 1420 (9th Cir.1992)), defines a "frivolous" claim as "... one that is 'both baseless and made without a reasonable and competent inquiry.'" *Id. quoting Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362 (9th Cir.1990) (*en banc*) (emphasis supplied).

Seven months later in the case of *Judin v. United States*, the Federal Circuit addressed that issue. Again vacating a district court's denial of Rule 11 sanctions, the Court wrote:

> ... [P]rior to the filing of the suit, neither Judin or his counsel had made a reasonable effort to ascertain whether the accused devices satisfied the two key claim limitations, either literally or under the doctrine of equivalents. No adequate explanation was offered for why they failed to obtain, or attempted to obtain, a sample of the accused device from the Postal Service or a vendor so that its actual design and functioning could be compared with the claims of the patent. Under these circumstances, there is no doubt that Judin failed to meet the minimum standards imposed by Rule 11, and his attorney acted unreasonably in giving blind deference to his client and assuming his client had knowledge not disclosed to the attorney.

*Judin*, 110 F.3d 780, 784 (Fed.Cir.1997).[4]

The district court had denied Rule 11 sanctions because, in its view, if a proper investigation had been conducted before the case was filed, it would not have made a difference. As described by the Federal Circuit:

> ... [T]he trial court considered that knowledge of how the accused devices were constructed would not have made a difference to Judin or his counsel, due to their erroneous assumption of the breadth of the claims in his patent.

* * *

The court found that this "misconception was translated into a colorable, albeit unsuccessful, response to a motion for summary judgment" on infringement.

The trial court determined that, as a result, although there was a clear lack of literal infringement on a number of claim elements, the court was required to undertake a lengthy examination on summary judgment to determine that there was no infringement under the doctrine of equivalents. Accordingly, said the court, the arguments it rejected on summary judgment were not "uniformly frivolous." The court was of the view that a more thoughtful pre-filing examination would not likely have deterred Judin's interest in suit. The court thus concluded that Judin's pre-filing examination was "minimal," but not sanctionable.

*Judin*, 110 F.3d at 783.

The Federal Circuit disagreed with the district court's analysis. It held that a failure to conduct an adequate pre-filing investigation was sanctionable regardless of whether or not it would have led to the claim not being filed holding that the "... violation of Rule 11 was not cured by the fact that, after filing the complaint, Judin consulted with an expert and was able to make 'colorable' arguments in response to a motion for summary judgment on infringement." *Judin*, 110 F.3d at 785.

### 3. Title 35 U.S.C. § 285 and Rule 11, Fed.R.Civ.P., Compared

█ It appears from the case law that, unlike Rule 11, a failure to conduct an adequate investigation, without more, is not grounds for finding a case to be "exceptional" under 35 U.S.C. § 285. Rather, the cases which deal with § 285 in the context of a failure to perform an adequate pre-filing investigation find the case is "exceptional" not only because of that lack but also because the claim was frivolous or baseless.

An example is the case of *Eltech Systems Corporation v. PPG Industries, Inc.*, 903 F.2d 805 (Fed.Cir.1990). In that case, the Court of Appeals affirmed the district court's finding that the case was "exceptional" under § 285 because of inadequate investigation be-

---

4. In *Judin*, the Court was dealing with Rule 11 of the Rules of the Court of Federal Claims. However, the Court noted that that Rule "is patterned after the 1983 version of Rule 11, Fed.R.Civ.P."

*Judin*, 110 F.3d at 783, n. 1. The two rules are, for substantive purposes, identical. As in the instant case, the 1983 version of the Rule is applicable.

fore filing the complaint and after filing when it continued to prosecute the case. The Federal Circuit noted that:

> [W]e [have] said the reasonableness of the patentee in assessing infringement was a proper consideration. Where, as here, the patentee is manifestly unreasonable in assessing infringement, while continuing to assert infringement in court, an inference is proper of bad faith, whether grounded in or denominated wrongful intent, recklessness, or gross negligence. The alternative, abuse of the courts through manifestly unreasonable lawsuits based on uninvestigated allegations, would constitute a blot on the escutcheon of the law and a violation of Rule 11, Fed.R.Civ.P.

*Eltech,* 903 F.2d at 811.

The Court also noted that "under § 285 the interest of the patentee in protecting his statutory rights is balanced by the interest of the public in confining such rights to their legal limits." *Id.* at 810 (citation omitted).

The clear import of the decision is that the case was "exceptional" within the meaning of § 285 in that the claims of infringement were frivolous and a proper investigation would have shown that to the plaintiffs. Other cases involving the same issue are to the same effect. For example, in the case of *Enpat, Inc. v. Microsoft Corporation,* 26 F.Supp.2d 811 (E.D.Va.1998), the district court found the case to be "exceptional" because it was "frivolous" and noted that "[a] suit is frivolous where the patentee knew, **or should have known by reasonable investigation,** that the suit was groundless." *Id.* at 812 citing *Haynes International, Inc. v. Jessop Steel Co.,* 8 F.3d 1573, 1579 (Fed.Cir. 1993).

With the legal landscape thus sketched, the facts pertinent to the defendant's motion shall be addressed.

### B. Applying the Law to the Facts of this Case

1. *The Alleged Failure to Conduct an Adequate Investigation Before Filing the Complaint on January 19, 1993*

■ The initial complaint filed by Ultra-Temp alleged infringement by AVS of a met-

allurgical furnace patent and three method patents[5], respectively U.S.Pat. Nos. 4,398,-702 ("the '702 patent"), 4,431,605 ("the '605 patent"), 4,575,449 ("the '449 patent") and 4,591,481 ("the '481 patent"). When the complaint was later amended, the plaintiff added claims for infringement of a roller conveyor system patent, U.S.Pat. No. 4,512,558 ("the '558 patent")[6], and unfair competition.

AVS contends that Ultra–Temp initiated this lawsuit upon learning that AVS had sold a metallurgical furnace to General Carbide but without undertaking any effort whatsoever to ascertain whether its patents in fact were infringed. In support of its position, the defendant points to the deposition testimony of Thomas C. Kershaw, the president of Ultra–Temp, which includes the following somewhat lengthy exchange:

Q. Okay. In that regard, what product or products of A.V.S.' did you see prior to the filing of this suit, if any?

A. What products have I seen?

Q. Yes.

A. None.

Q. Did you understand my question?

A. Yeah. I answered none.

\*\*\*\*\*

Q. Before this suit was filed, you did not see any A.V.S. products?

A. Products being furnaces, no.

Q. Okay. Did you see any drawings of furnaces of A.V.S.'?

A. No, I've not.

Q. Can you tell me what act or acts triggered you to instruct Mr. Sprinkle to file a Complaint?

A. Telephone conversations with customers, it's a small industry, and that's it.

Q. Okay. Tell me what customers did you have these telephone conversations with and when?

A. It was primarily Kennametal.

Q. Okay.

---

**5.** These patents involve metallurgical processes for densifying previously sintered parts.

**6.** The '558 patent is used in conjunction with a metallurgical furnace.

A. And it was last year.

\*\*\*\*\*

Q. Okay. Now, who at Kennametal did you talk with?

A. Chuck Martz.

\*\*\*\*\*

Q. And what—can you give me the substance of the conversation you had with Mr. Martz last year?

A. Just that General Carbide had purchased some A.V.S. sinter HIP furnaces.

Q. Okay. What else did he tell you?

A. That was it.

Q. And that was the basis on which you filed this lawsuit?

A. Yes.

Q. Okay. A statement from Mr. Martz in 1992 that General Carbide had purchased sinter HIP furnaces from A.V.S.?

A. Yes. It was confirmed by—I can't remember the other gentleman's name, someone else at Kennametal . . .

Q. Did they describe for you what the furnace looked like?

A. No.

Q. They just told you it is a sinter HIP furnace?

A. Yes.

Q. And as you understand it, your patents cover all sinter HIP furnaces?

A. Yes.

\*\*\*\*\*

Q. Now, you have told me everything you can remember about your conversation with Mr. Martz?

A. Yes.

Q. Okay. And the unknown—the unnamed person that you also talked to, besides Mr. Martz, what was the substance of the conversation with him?

A. Basically the same. That General Carbide, who we had quoted several furnaces to, had purchased units from A.V.S. And we didn't know that. And that was it.

Q. Okay. Well, following that, did you - what did you do when you found that out?

A. Instructed Doug [Sprinkle] to file a lawsuit or to find out - we have a routine where we send a letter basically saying please tell us if you've sold any furnaces.

Q. Okay. So you sent a letter to A.V.S., is that what happened?

A. Yes.

Q. Okay. And then what happened after that?

A. Letter basically came back saying that, yes, we've sold some furnaces. And we had some subsequent conversations, I did myself, directly with Mr. Buck regarding his interest, if any, in purchasing a license. And that that (sic) was, I'll say, probably the gist of that conversation. And based on that I instructed Doug [Sprinkle] to file suit against A.V.S. and, right behind it, General Carbide.

\*\*\*\*\*

Q. I think that you answered this question, but I'll raise it again: You've never really seen an A.V.S. furnace, have you?

A. No.

Q. Okay. Now, have you ever asked Mr. Buck or anyone at A.V.S. to send you a print of the design or describe the design of furnace before this suit was filed?

A. No.

Q. You were satisfied, at the time the suit was filed, that their supplying a sinter HIP furnace to General Carbide was sufficient information for you to institute a suit, is that correct?

A. Yes.

Defendant's Memorandum # 219, Exh. A at 50–4, 77–8.

Similarly, in answer to an interrogatory Ultra–Temp states it did not undertake an examination of any furnace manufactured or sold by AVS. (# 219, Exh. B) It is further declared that

With respect to the investigation conducted by Ultra–Temp prior to the filing of this lawsuit, this investigation included discussions between Mr. Thomas Kershaw and Mr. Norman Buck upon at least one occasion including a trip by Mr. Kershaw to the Boston area for discussions with Mr.

Norman Buck. The precise context of these discussions are no longer known since they occurred several years ago.

The further investigation of Ultra–Temp Corporation prior to filing this action included the discovery that AVS was the manufacturer of the General Carbide furnace. At this time, Ultra–Temp Corporation does not know exactly how it learned that AVS was the supplier of the General Carbide furnace but that fact did become known to Ultra–Temp Corporation prior to the filing of this lawsuit in January, 1993.

Other investigation of Ultra–Temp Corporation prior to the filing of this lawsuit in January, 1993 involves facts more in the nature of "knowledge" of Ultra–Temp Corporation rather than "investigation" by Ultra–Temp Corporation. Specifically, Ultra–Temp Corporation was well aware of the design criteria as well as the processing steps General Carbide would utilize in its low pressure sinter hip furnace simply because Ultra–Temp was bidding against AVS for the same job. As such, Ultra–Temp Corporation had knowledge that a low pressure liquid phase sinter hip furnace constructed in accordance with the requirements of General Carbide will infringe each of the four patents-in-suit.

Defendant's Memorandum # 219, Exh. C. at 5–6.

The extent of Ultra–Temp's "knowledge" as related in the latter interrogatory answer is belied, at least in part, by the testimony of Mr. Kershaw:

Q. Well, as you sit here today you don't know what the furnace in General Carbide is like yourself, isn't that true?

A. Specifically, no.

Q. And, as you sit here today, you don't know how General Carbide uses that furnace in this sinter HIPing, do you know?

A. Specifically, no.

Q. And nobody else in Ultra–Temp knows either, do they? Because you're the only employee.

A. Nobody knows anything about something they haven't seen or haven't watched happen. Tungsten carbide is a very secret

and unique process that every single manufacturer with a vengeance.

Defendant's Memorandum # 219, Exh. A at 298–99.

Moreover, when questioned about the process in which General Carbide engaged for soliciting bids from furnace manufacturers, the company president, Premo J. Pappafava, testified:

Q. Were there any parameters on this oral request for quotations for a sinter-HIP furnace?

A. No, the only parameters that they would get would be that we would like a 9 cubic foot furnace, and we want it capable of sintering cemented tungsten carbide parts; and then we would let that up to them, to tell us what they have; if they have experience, we would certainly want to know about it.

Defendant's Memorandum # 219, Exh. D at 32–3.

AVS avers that this evidence clearly and plainly demonstrates that Ultra–Temp admittedly did not conduct a pre-filing investigation by either comparing the claims in its patents to the allegedly infringing furnace and methods or seeking information that would make such a comparison possible. The defendant's point is well taken.

The basic facts of the present case are that Ultra–Temp learned from a third-party that AVS had sold a furnace to General Carbide and, armed with that knowledge, Ultra–Temp authorized the filing of this infringement action against AVS. The cases make crystal clear however that mere assumptions of infringement, without more, do not suffice to constitute a reasonable investigation.

Ultra–Temp offers little to counter AVS' persuasive evidentiary presentation. For instance, the fact that other companies may have licensed the plaintiff's patents does not either render Ultra–Temp's pre-filing investigation reasonable or somehow support a conclusion that AVS' furnace and methods infringed those patents. So, too, the fact that AVS refused to pay for such licenses could cut either way; it is certainly not enough alone to support the filing of an infringement complaint. Nothing that Ultra–Temp pres-

ents undermines the defendant's argument that the plaintiff did not compare the claims in the patents it sought to enforce to the allegedly infringing device or request information, such as a design of the print, upon which such a comparison could be made.

Considering all of the evidence and arguments proffered, there can be no doubt that Ultra–Temp undertook little, if any, investigation prior to filing its infringement complaint. Ultra–Temp's conduct was more than simply negligent, it was reckless at best. The evidence unequivocally demonstrates that Ultra–Temp failed to conduct the "reasonable inquiry" mandated by the 1983 version of Rule 11, Fed.R.Civ.P., prior to filing its Complaint on January 19, 1993. I therefore find that Ultra–Temp [7] violated Rule 11, Fed.R.Civ.P., and that sanctions in the form of an award of reasonable attorney's fees to AVS is warranted.

■ That said, I do not find clear and convincing evidence that the other claims set forth in the Complaint were so lacking in merit as to be able to be denoted "frivolous" either at the time they were filed or as the litigation progressed. Accordingly, I do not award attorney's fees pursuant to 35 U.S.C. § 285 as to those claims.

*2. The Alleged Failure to Conduct an Adequate Investigation Before Filing the First Amended Complaint on February 22, 1994*

■ The First Amended Complaint, filed on February 22, 1994,[8] added Counts V and VI. Count V alleged infringement of the '558 patent. Count VI contained a claim under the Lanham Act.

Since the 1993 version of Rule 11, Fed. R.Civ.P., came into force on December 1, 1993, its terms would govern the filing of the

Amended Complaint. While the new version contains the provision respecting "reasonable inquiry," *see* Rule 11(b), there are specific requirements for a motion for sanctions. First, the motion must be made "separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b)." Rule 11(c)(1)(A). AVS' motion fails to comply since it contains "other ... requests", *i.e.*, an award of sanctions under 35 U.S.C. § 285 and 28 U.S.C. § 1927. Second, Rule 11(c)(1)(A) further provides that "[the] motion shall be served ... but shall not be filed with or presented to the court unless, within 21 days after service of the motion ..., the challenged ... claim is not withdrawn or appropriately corrected." AVS' counsel did not comply with this requirement.

Notwithstanding these strictures on motions for Rule 11 sanctions, the Court has the power under Rule 11(c)(1)(B) to issue an order to show cause why such sanctions should not be imposed. I decline to exercise this power in the instant case for the simple reason that there is no evidence in the record respecting the adequacy of the investigation which Ultra–Temp conducted before filing the claims contained in Counts V and VI of the Amended Complaint. All of the record evidence pertains to what Ultra–Temp did or did not do prior to filing its original Complaint on January 19, 1993.

Accordingly, no attorney's fees shall be recovered in connection with the defense of the claims contained in the Amended Complaint relative to the '558 patent and the cause of action under the Lanham Act.

*3. The Alleged Bad Faith Continuation of the Claim Involving the '702 Patent*

■ According to AVS, a circumstance which demonstrates the plaintiff's bad faith

---

7. The Complaint is signed by Douglas W. Sprinkle, Esquire, of Birmingham, Michigan. It is also signed by Ralph A. Loren, Esquire of the firm of Lahive & Cockfield, in Boston, Massachusetts whom I presume is local counsel. Under the 1983 version of Rule 11, Fed.R.Civ.P., these attorneys are also subject to sanctions as signers of the Complaint. I make no findings at this time with respect to these attorneys because AVS' motion appears to seek attorney's fees only as against AVS, and, thus, the attorneys have not had an opportunity to address issues of their personal liability for sanctions. However, under

the 1983 version of Rule 11, the Court has the power "upon its own initiative" to impose sanctions "upon the person[s] who signed it, the represented party or both ...". Thus, I have issued an Order to Show Cause this date directing these attorneys to show cause, if any there be, why they should not be also sanctioned for the filing of a Complaint without having conducted a "reasonable inquiry" as mandated by the Rule.

8. Hereinafter, "the Amended Complaint."

was Ultra–Temp's failure to investigate the fact that it was not the owner of one of the patents upon which it sued. Ultra–Temp has filed an affidavit of a former principal of the company, Roy C. Leuth, wherein Dr. Leuth acknowledges that the '702 patent was at some point reassigned to him by Ultra–Temp, but he further avers that "[t]o the best of my knowledge I reassigned the '702 patent back to Ultra–Temp prior to the commencement of this lawsuit, but I cannot find the written assignment." (Plaintiff's Brief # 225, Exh. F) The documentation[9] submitted by AVS, however, reflects that Dr. Leuth in fact is the owner of the '702 patent. Although Ultra–Temp was advised of this fact by AVS in late 1992,[10] the plaintiff did not withdraw its infringement claim with respect to the '702 patent.

In ordinary circumstances, continuing to prosecute a patent which proof of ownership in the plaintiff is lacking after the issue had been raised would certainly demonstrate bad faith. However, in the circumstances of this case, I do not find that this factor renders the case "exceptional" justifying an award under 35 U.S.C. § 285 for the simple reason that despite knowledge of the issue, AVS on September 15, 1994, filed a motion for summary judgment on non-infringement of the '702 patent (# 58) together with a twenty-six page brief in support and **never mentioned the asserted fact that Ultra–Temp did not own the patent.** Presumably the reason AVS did not do so is that if it prevailed on that ground, it would be anticipated that Dr. Leuth, the record owner, would have simply brought the claims of infringement of the '702 patent in his own name. A finding by the Court on the merits that AVS' product did not infringe the '702 was preferable.

While I do not fault AVS' tactics in choosing to get to the merits as speedily as possible, it can hardly be said that all the attorney's fees which were generated in prosecuting the successful motion for summary judgment as to the non-infringement of the '702 patent should be the responsibility of Ultra–Temp.

9. Ultra–Temp itself produced these documents with the exception of the reissue/reassign database search record. (# 219 at 5 and Exh. F, G, H, I)

Accordingly, I decline to find this case to be "exceptional" on the basis that Ultra–Temp was unable to prove ownership of the '702 patent.

### III. Conclusion and Order

For the reasons stated, AVS is entitled to a reasonable attorney's fees as a sanction for Ultra–Temp's violation of the 1983 version of Rule 11, Fed.R.Civ.P., in filing the Complaint on January 19, 1993. Therefore, to that extent, it is ORDERED that the Motion For Attorney Fees (# 218) be, and the same hereby is, ALLOWED. It is FURTHER ORDERED that said motion be, and the same hereby is, otherwise DENIED.

It is FURTHER ORDERED that AVS file documentation in support of its request for attorney's fees concerning the defense of the claims contained only in the Complaint filed January 19, 1993 **on or before the close of business on Monday, October 25, 1999.** It is FURTHER ORDERED that Ultra–Temp file any objection to the defendant's submission **on or before the close of business on Monday, November 22, 1999.**

10. *See* Defendant's Memorandum, Etc., # 219, Exh. J. at 9, 12.